Good morning, Your Honors. May it please the Court, Stephen Rennick for Appellant Corporal Ruben Perez. The District Court overruled the summary judgment motion because it found that there were disputed facts that prevented determination on summary judgment. Our contention, as we've laid out in our briefing, is that based on what is acknowledged to be the undisputed facts, Corporal Perez's actions were reasonable under all of the facts and circumstances that were before him at the time that he fired his weapon. Our basic dispute with District Court is that it looked at the facts and circumstances in a very narrow manner. It essentially looked at what happened from the point from which Jeffrey Monroe began running away from the car and when the shots were fired. Our contention is that you cannot look at that situation in this very narrow manner. You have to look at the entire situation, which unfolded just over a matter of, I'm not even sure what the total time period, but it's moments, from the moment that Corporal Perez exited his vehicle until the shots occurred. Counselor, is it your argument that the District Court did not take into consideration all of the facts that preceded the shooting? Certainly not based on the ruling. Our contention is that the totality of the facts, most of which are beyond question undisputed, lead to the inevitable determination that Corporal Perez's actions were reasonable. I'm just curious as to why you think the District Court didn't consider all the facts. Some of the comments that the Court made, basically the fundamental finding that it's a question for the jury as to whether or not Mr. Monroe was running towards Corporal Perez or to the driveway. So why does that infer to you that, why does that imply to you that the District Court didn't look at the other facts? Because the question, as we contend it should be considered, is whether or not Corporal Perez reasonably was concerned that his safety was at issue. And whether or not, in fact, Mr. Monroe was running to the driveway isn't really relevant to that question as long as, I'm sorry, Your Honor, as long as Corporal Perez's evaluation of what was happening was reasonable. My understanding of your position is that your client arrived, that it's undisputed that the decedent approached abruptly and immediately, walked rapidly towards your client, and there's this sort of inexplicable attack. Right. Very tragic because of course he's suffering a mental health issue. By the way, I can't see anything in the record that shows that your client knew that. I'm not aware of anything that would have. It comes out and then there's this attack with a screwdriver. Right. And I think your client told him to stay back. He didn't stay back. I think the District Court recognized that there had been that screwdriver attack. She was clearly concerned about the fact that I think all of the bullet trajectories indicate that he was shot from behind as he was running away. Maybe the distance was closed at some point or not. I don't find that particularly important. I think she's looking at, a jury could look at a lot of shots fired at somebody who was running away and they entered the body from behind. At best, there's one that went through his hand, through the palm of his hand. Right. And then on the 14th Amendment claim, I think that she recognized, or I think the basis of her ruling, to go to Judge Rawlinson's point, was that a jury perhaps could find that the shooting was the result of, or in retaliation for, that's my word, the screwdriver attack. So I don't see that the District Court overlooked any part of the record. I guess, excuse me, ultimately whether or not the basis for the District Court's ruling really isn't ultimately relevant here. It's a de novo review by you as to whether or not the undisputed facts support or don't support that. But particularly on the 14th Amendment issue, that ultimately flows from the fact that if a jury could reasonably believe that Corporal Perez knew that he was not, that Mr. Monroe was not coming towards him but was running to the driveway, they could draw the inference that this was a retaliatory action. Our argument is that you can't draw, that that assumes that Corporal Perez was aware that he was running to the driveway and not towards him. Well, the best you've got on that is a one-sentence fragment in the deposition where he says, it looks like he was coming towards me for a second. Well, we also have... Right? It's not a lot. Well, except that the evidence that was provided by the plaintiffs themselves from their expert as to the route that Mr. Monroe took when he began running, that he closed from 27 to 22. But let's say he did look like he was coming back towards the officer. We don't know at what, where in that trajectory, where in that path the decedent was shot. But certainly not all nine shots were fired when he, you know, had closed the gap. At some point, some of those shots were fired while he was running away. Correct. But what we do know from the expert's analysis is that the shots began being fired at the 22-foot mode position. And they continued. For three seconds. Right. Really fast. And I think your position from your brief is that your client had suffered this attack and thought he might pass out. And he's alone. He's the only officer there. Exactly. And so that he responded the way he responded. And we know we give a lot of leeway under this doctrine. So that even if he was wrong, the question is, was he unreasonable in continuing to fire? And that's our position is that given that this was three seconds, where if you take, if your honor is parsing out the various shots, let's look at the initial. I'm not suggesting this record allows us to parse out the shots at all. Okay. Well then. I think your best shot is that the officer was inexplicably attacked and that was very upsetting and terrifying. And he thought he might pass out. That's his testimony. I think that's uncontested. That's what he thought. He didn't pass out. I think that's also uncontested. But that once the decedent started to move, there's at least some indication from plaintiff's diagram that he closed the gap. He's running diagonal, I think, generally. But that be that as it may, the officer shot and he shot nine times. Yes. But you know, we talked about in the case law, split second decision. The officer, as you've just described, it was not, this was not somebody who just stepped out of his police vehicle. How important is it that he thought he was going to pass out? I think it's very important. I think this goes to the second prong of the qualified immunity analysis. Is there a case essentially directly on point that are close enough that would put an officer or any officer on notice? But after, I guess, I think we have suggested that if the officer and decedent have disengaged, there is the importance of that initial engagement recedes, becomes less material because we expect the officer to, I get that in this case, because of the attack and maybe, and again, the corporal might have worried about passing out. But usually we expect the kind of things to reset after that initial engagement and that the decedent still has all the rights they had before that, not to have excessive force used against them. I think the problem with taking that, excuse me, analysis literally is how much time has there been for that reset? This is a continuing... But the, I mean, there are genuine disputes here, maybe not as to the time in terms of the corporal's awareness, but he was, it's taking the facts most favorable as we must. He was pulled back by his brother. He was disarmed. He was behind, off to the side behind a car. So those are, this is not a continued melee that's leading to the firing. Correct. But you mentioned he was disarmed. There's no evidence that Corporal Perez was aware of that. And one of the things that Apollese brought up in their briefing is that a lot of case law talking about you can't, just because there's been a prior attack, you can't use deadly force when someone is no longer a threat. But again, if you look at the entirety of this, what was confronting Corporal Perez when Jeffrey Monroe began running the second time was that this was essentially the same scenario that had just happened to him. The decedent had started running at him. No weapon was visible. Why is that not subject to genuine dispute in an issue for trial? Whether it was the same? There's been lots of reconstructions. There's lots of things for jurors to consider here about whether it was the same. I'm not aware of anything that disputes the fundamental facts that the decedent was running. He was closing the distance between himself and Corporal Perez. Well, again, that's a function of the geometry of anyone who runs on a diagonal tangential to where someone's standing is going to first approach and then recede from the person. Certainly they should be going opposite in this instance. Yes, you're right. But from the perspective of Corporal Perez, he was coming towards him. Well, he doesn't really say that. Like I said, your client says it looked like he was coming at for a second. And I think the diagram is the way Judge Johnstone indicates. So to say that it's uncontested seems to me to be a bit of a stretch. The initial approach, I think he says it was abrupt. I think that is uncontested. He walked straight at him, inexplicably. But the second time around when he went to run, his body just about had to be facing not directly towards the officer unless he was doing a side shuffle. He would have been facing off at an angle. Again, you know, the question is reasonableness, not perfection. That's right. And whose question is that, though? I think why isn't that the jury's question given what we have before us? The essence of qualified immunity is it doesn't, mistakes are understandable, can happen. That the question is this particular officer confronting a situation, while not identical, at least bore some semblance to his mind, which was the mind of someone who had just been attacked and injured by a man who may have been armed just like he was armed before with a weapon that was not immediately visible to him. And it's uncontested that at no time during the attack was Corporal Perez aware of what weapon was being used. He makes a split-second decision that he was at risk. That's what qualified immunity is for. Certainly there is no case that we're aware of, and the ones that were cited by the appellee are not similar enough to provide guidance here. There's no case that says an injured officer facing this sort of roughly similar situation must wait until he's positive that he's about to be attacked before he can take action to protect himself. A jury might find that he was wrong about whether or not the attack was going to happen, but the question is whether, within the context of the existing law, it was unreasonable for him, in the totality of the facts and circumstances that he was facing, to come to that conclusion. I see I only have two minutes left. If the Court doesn't have questions at this time, I'd reserve the remainder of my time. Thank you, Counselor. Thank you. Good morning, Your Honors. Kaveh Nawab here, and may it please the Court, on behalf of plaintiff appellees. I think this Court and courts throughout this country, all the way to the Supreme Court, have repeatedly held that for an officer to use deadly force, they have to be under imminent harm. I think the District Court, in this matter, on the motion for summary judgment, issued an exhaustive and detailed order going through the entire record, including circumstantial evidence, including testimony of the witnesses, and I think the Court is correct that the jury needs to decide this case. There are a number of issues at dispute, material facts, not periphery facts, but material facts. And I know that Deputy Perez had an interview with the DA seven days after the shooting. That's part of the record here. And in that DA interview, he had three opportunities to speak to this second attack. Not one mention of a second attack was made. And I think the Faro scan had... A fear of second attack that I'm going to pass out? Is that what you're... Well, I think, exactly. Well, coming toward Mr. Monroy, coming toward the officer a second time, which is what the justification for the use of force is here. What we do know is that Mr. Monroy did attack the officer. There was an altercation. His brother, Wilbur Monroy, pulled him away 20 feet to the vehicle. Corporal Perez pulled out his gun, actually went toward the threat, had enough time to tell Wilbur to go away. Because he was going to arrest him. Yes, but what is it from that point, once the decedent then started to run, what is it you think was left out of the DA interview? Well, the second kind of coming toward him, as was stated for a second. I think the court stated that in his deposition, he said maybe for a second he came toward him. That was never mentioned. What was said in the DA interview... But it was said at some point. So you're parsing what he said to the DA as opposed to what he said in his deposition. Yes, and I think this court has on a number of times, actually, in the Lamb case, the Bonyos, I believe it is, in a number of cases, that the officer's credibility and the conflicting statements from the officers, those are things that the jury can take into consideration. Are those conflicts, though? The problem I'm having with your argument is that those are two different fora. And so in a deposition, you're more focused and you go into more details than you would with the DA interview. So I'm not sure that those would be considered conflicting if there is more detail in the second one than in the first one. Understood, Your Honor, and that's accurate. I mean, a deposition is a little different than a district attorney's interview. But I do think it is telling that this advance toward him was never stated. Instead, what he did say, which is what the expert report and the path that's taken, that's exactly what he said. He said, it went to the right of me and I see a driveway and I'm shooting. And what do we do know is that that distance was quite a bit, 22 to 30 feet. The shots to the back were all back to front. Did he say in the DA interview that he thought he might pass out? He may have said that he was, I don't know if he used the exact words of pass out, but I think there's, I think he may have said that he was kind of in this concern that he was, you know, his body was getting hot. Unless my notes are wrong, then I will surely double check. I think he said something about his face was getting hot or his head was hot and he thought that he might. That's accurate. I do think he did say his face was getting hot. But I think what we have to also understand there is that he never went to the ground. What he did do was he unholstered his gun. He moved toward them. Okay. He issued a command to the brother to get out of the way. Okay. So I think that that's all, but these are all disputed facts that really need to be. At what point did he say to Wilbur to keep your eye on me because I think I might, don't want to come any closer, but keep your eye on me. Where, where did he say that happened in the sequence? Oh, that's after the shooting. That's after the shooting was done. That's what I thought. After Mr. Monroy was, you know, essentially passed out. That's what my notes show. So I originally thought that this whole business about being concerned about passing out was after the shooting, but it's not. He's very clear that it was before, I mean, the, the officer is very clear in his testimony that he thought after being, the stabbing incident that he might pass out. No, the statement to Mr. Monroy, stay back to the brother, if I understand. Okay. So there's, there's, I don't want to confuse, confuse. When, when the decedent first approached the officer, he said, the officer told him to stay back. He didn't stay back. Then there's the stabbing. Then there's testimony from the officer that he said he thought he felt faint and might pass out before the shooting. Then there's the shooting, which of course would be also very, I'm sure adrenaline would go sky high. And I think there's the statement to the brother, to Wilbur, after the shooting, he said, don't come any closer, but keep your eyes on me because he thought he might pass out. That's correct, Your Honor. It was after the shooting, after the decedent had already fallen in the driveway, he says that to the brother who's now by the Corolla, you know, over there. So that's, that, that is a sequence, Your Honor. And I think what's, what's telling here is that as this court has on numerous occasions, and I think as, as Your Honor stated, it does reset. Just because there's a threat at one point doesn't mean that the threat continually goes on. What we do know is from the Tam Land case, from the Hopkins case, from a number of other cases, that just because there's a threat or somebody's armed with a weapon, even a gun in some instances, that doesn't mean that continually throughout the sequence, once that threat dissipates, that the officers have carte blanche to just use excessive force. And what we do know here is that he was at a distance, he was shot a number of times in the back when there wasn't any imminent harm to the officer. So what about opposing counsels? I think everything you said is correct. But I can't think of a case, and I can't find one, where the officer had been injured and thought he might pass out. And he's alone. That's the other thing. He's alone. So is there one, first of all, that we missed? Well, I think the Hopkins case, which is actually a couple decades, he was the officer in that case, and it's from 1992, was hit a number of times by the baton. This is Hopkins versus Undia from 1992, decided by this court. In that case, the individual, the suspect, grabbed the officer's weapons, the baton, I believe, hit him multiple times. The officer said he was injured as a result of that. The force occurred. So I think that is a telling case. What happened in that case, the jury, there was disputes as to the extent of the injury in the Ninth Circuit. This court said, well, there's disputes here if the attack was the way the officer described it. Well, there's lots of cases like that, where there's sort of mutual combat, and is the force excessive, given the force? We certainly have case law like that. But I'm talking about case law where the officer said, because of the injury, he thought he was going to lose that threat is knocked out in case he loses consciousness. I don't know if there's an exact case where the officer said, I'm going to lose consciousness, and I used force, because I thought I was going to lose consciousness. But I think the Hopkins case is informative, because this was a serious attack, at least from the officer's perspective, with the baton. And I think Tam Lam, or Tan Lam, my apologies, the city of Los Banos case, Los Banos, he was in that case, the officer was stabbed with the scissors. He retreated. The individual, there was no dispute in that case, came toward the officer during the second volley of shots. And so in that case, it went to a jury, which is essentially what should happen here. In this case, there's a number of disputed facts. There's an ample amount of evidence for the jury to consider in this matter. And that's why this case is not properly before the Court of Appeals, because it needs to go back to the jury. Well, I guess the problem is the qualified immunity posture here. And as Judge Christin has alluded to, we don't have, if indeed the prior attack was material, both to either the Fourth or the Fourteenth Amendment claims, we don't have a clearly established right. I'm sorry, you mean if under the Fourteenth Amendment? Under either one, right? I mean, that's the problem, is with the underqualified immunity, we have cases that well establish that shooting someone in the back as they're fleeing, I guess you have a clearly established right against that. I guess I'm just trying to figure out how we frame these other concerns, which are not in those other cases, the concerns about the prior attack potentially debilitating the officer from future defense of himself or others. Where does that, I mean, I think not a factual dispute, it's just whether is that material to our inquiry for qualified immunity purposes. Well, I think the totality of the circumstances, of course, are important in terms of the entirety of the incident. But I think, as Your Honor stated earlier during the argument, that there is a reset, there's ample amount of cases that state when a threat might have existed with either a gun or some other kind of weapon, here was a screwdriver that was taken away, just because that threat at some point existed doesn't mean it continues once it's dissipated. But counsel, you're reading in, the screwdriver, the officer never saw the screwdriver, that it was taken away, the officer didn't know that either. He didn't know how he'd been attacked, and it's really a compressed time frame, right? We do have a lot of case law that talks about 20-20 hindsight. So this is a hard case. Well, I know those cases about 20-20 hindsight, but what we do know, and this is where the officers. You can get down to the centimeter as to the distances of the bullet casings, where the body landed, where the shots were, all the evidence on a 3D image, and that's what the expert used here. And so you can tell, it was a rapidly unfolding event, but we also know the distances. And 30 feet or 22 feet, getting shot in the back, just because there might have been a threat or just because a weapon was used previously, but once that clear, and it was clearly established at the time, if there's no imminent harm, that you cannot use excessive force. Why can't we look to the harm that the officer might have apprehended if he had passed out or been unable to respond to that? Well, understood, but what we do know here is that he didn't pass out. Well, but that's hindsight, right? That's it. It's 20-20 hindsight. Well, because it's an objective standard. It's not a subjective standard. And this court has repeatedly said, well, just because an officer... But what if we have an officer in those shoes, this guy's been attacked, and he thinks he might pass out? What about that hypothetical officer? We don't expect perfection. I understand, Your Honor, we don't expect perfection, but that's also a subjective situation. Well, just, I'll stay out of your way here, but I just am not hearing a response to where on the qualified immunity prong, how would we get to, to go back to Judge Johnstone's question? I think he was circling back to mine, and maybe, maybe Judge Wallinson started us off. But this seems to be the focus of our concern. We don't have case law that says this. That, in the scenario where an officer says he was going, he thought he was going to pass out. Sure, there might not be an exact case where an officer has made that statement, but I think an officer at the time, in Officer Perez's shoes, would have known that using force on an individual when there's no threat, right, just because he may have imagined that he was going to pass out. Again, that's a subjective thought. We have to look at the objective facts. Are you talking then about immediate threat, because there has to be an immediate threat of harm, and you think it's not immediate enough because he wasn't sure he was going to pass out? Is that it? Yes, and I think that's, that's correct, Your Honor. I think that is the law. There needs to be an imminent harm, imminent threat of harm, serious injury, or death. And that just does not exist in this instance because of the distance, because of the fact that he was taken away, and because, one, the officer never did pass out. I mean, he may have thought that. That's still a subjective thought, but that's why we have to look at the totality of the evidence here. So I'm just trying to get your argument. It seems to be in a nutshell, you don't think this was imminent enough. The risk to the officer wasn't imminent enough. Is that it? That is it, Your Honor, and I think that's the case law for decades, that there needs to be under an imminent threat. So are you essentially arguing that this is an obvious case and you don't have to have one on point because it's so obvious that an officer would have known that if a suspect was fleeing and there was no immediate threat, as you interpret the circumstances, that it was obvious that the officer would have known not to shoot a fleeing suspect in the back? Is that your argument? That is, Your Honor. I do believe it's an obvious case, and I think this Court has on every single fact because, of course, that's not what occurs most of the time. Right. Could I ask you, your time is running out, but I wanted to ask you about the 14th Amendment claim because I see those as a little different. Because of the 14th Amendment claim, there has to be an intent to harm on the part of the officer. Well, I think here a reasonable jury could see that the initial attack caused the officer to retaliate against them, and there was time for contemplation here again because... But if there is a clearly established case that would support a 14th Amendment claim in this context, the intent to harm is a very high standard. Well, I think there's also a deliberate indifference standard, but I think the Tam Land case... I don't think it's deliberate indifference for 14th Amendment. Purpose to harm. Yeah, it has to be a purpose to harm. Well, I think the Tam Land case does have evidence because, again, if the officer, if he wasn't under imminent harm, then the use of force is categorically unreasonable. That's excessive force, but it's not an intent to harm. Intent to harm is a higher standard, not just excessive force, but it has to be that the officer actually shot him, not for a law enforcement purpose, but to harm him for a reason that's not related to law enforcement. So that's a very high standard. So on this record, what was there in the... Even looking at the facts most favorably to the plaintiff, what was there that would support a finding by the jury that there was an intent to harm? Well, Your Honor, I think just as the district court opined here, if the jury, a reasonable jury, looks that there was no imminent harm and that the individual was shot in the back at a distance, that can be considered a purpose to harm because there was no imminent threat. So there would be no difference between the analysis on the excessive force and the intent to harm? Well, I think you'd have to look at whether, in the context of the retaliation, of course.  So if you've been attacked and a person's now running away, there's no real threat to the officer, and at a distance of 30 feet he shoots somebody in the back, then a jury can infer that that was a purpose to harm because now there's no threat, he's 30 feet away from me, and I'm shooting him in the back. So I think a reasonable jury can infer... What's the case that would clearly establish that for purposes of qualified immunity? Well, I think Tam Lam speaks to that, to the 14th Amendment. I think also... It speaks to the 14th Amendment, but is it anywhere close to the facts of this case so that we can say it's clearly established? Well, again, I think it goes back to the obvious standard. I think it's clearly established based on the precedent of all the cases that have held that an imminent harm, if the officer's not under imminent harm, then you can meet that standard. Because, again, there's not an exact case under the 14th Amendment with these facts, but what we do know is that if there's no harm and a person's at a distance and being shot in the back, that can be inferred by the jury to be a purpose to harm. But that's true for your excessive force claim, because we do have some cases that talk about shooting in the back for excessive force. But the intent to harm, I'm not sure that you can use those same cases to say this is an obvious case of intent to harm. Well, I will say there's no exact case under the 14th Amendment. What's your closest case under the 14th Amendment? What's the 14th Amendment case? Is Tan Lam your closest? I think Tan Lam's the closest case. So tell me the language in Tan Lam that you say clearly establishes that the facts of this case amount to intent to harm. Well, I think in that case, because it... Well, give me the language in the case that would put an officer on notice that the intent to harm... Oh, I also... I misspoke. There's also another case, Your Honor. Well, tell me, is Tan Lam... The S.R. Nahad case versus Browder. That's another case, Your Honor. Okay, wait, wait. Counsel, counsel, wait. Is Tan Lam your best case? I think that case, which also references S.R. Nahad, both of them do. Now, in Tan Lam, the jury found... Wait, wait, wait. Counsel, could I please tell you where I'm going? Yes. Point me to the precise language in Tan Lam that you think would put an officer on notice that these actions would constitute an intent to harm. That's what I'm looking for, for the clearly established prong on the 14th Amendment. Well, I think, and I can bring you on page... In Tan Lam, the site is 1003 and 1004 Penn site in that case. They discuss the purpose to harm standard is a subjective standard, and the officer violates the due process clause if he used deadly force with only an illegitimate purpose in mind. So, for example, if he acts with an objective to bully a suspect or get even, and that's also referencing the Wilkerson case. So when an officer is acting with the intent to bully or get even, I think that's Wilkerson's actually been, I think, the law in the Ninth Circuit for well over a decade. Then, in that instance, the officer, if he's trying to get even with a suspect, again, here there's an altercation. He's running at a distance, shot in the back. I think a reasonable jury can make the inference that he was acting with the purpose to harm. Tan Lam said that there was not an intent to harm in that case, so I don't think that case helps you. Well, ultimately there was not, but the case law that it references under the 14th Amendment, which is the Wilkerson case, the S.R. Nahad case, both of those cases, again, the standard is if the officer has essentially a grudge, an ax that he wants to grind with an individual. Now what we do know here is he was attacked, he's running away, shot in the back. So I think the case law has been around for a while. That would make it clearly established. If you're trying to get even with a suspect, then you can perhaps meet that 14th Amendment purpose to harm standard. All right, counsel. We've helped you exceed your time. Are there any other questions? No further questions. Thank you. All right, I will give you a minute for rebuttal, counsel. Oh, no, you don't get rebuttal. I'm sorry. You exceeded your time. Thank you.  Thank you, Your Honors. Just to briefly address the last point, first of all, Tan Lam can't be clearly established law for anything in this because it was decided after this incident. What about the Foster case where we seem to be suggesting, and it's also Nahad is in the mix here too, but the Foster case that merely shooting someone in the back can provide the basis for that, the inference of a 14th Amendment violation? I think you have to look at the totality of the circumstances to make a determination whether you can draw that inference under the circumstances. In this case, the fact is that at the time the shooting happened, the Corporal Perez believed reasonably, unreasonably, whatever, that he was confronted with the possibility of another attack. Well, he said he might be. That's the problem. It is the question of whether he reasonably understood there was an imminent risk. I think part of the difficulty I'm having is there are two different standards here in terms of the Fourth Amendment and the 14th Amendment. I'm not spending a whole lot of time on the 14th Amendment in this argument. So my questions didn't go to the 14th Amendment. I think purpose to harm standards is extraordinarily high. So what about the Fourth Amendment? In terms of the Fourth Amendment, I would just repeat what I said during my initial argument, that under all the circumstances and given the circumstances in which Corporal Perez found himself at the moment he made the decision to fire, which was having been attacked, having been affected by this. There may be a dispute as to how seriously injured he was. But it can't be the case that in every police officer shooting situation, if a week later an officer says, you know, my adrenaline went sky high, I bet it does. And I felt dizzy or I felt faint or I felt that that can't be sufficient on its own. And so I'll just couple that with the injuries in this case that your client suffered. And at the end of the day, it is undisputed that he didn't pass out. But the injuries also were ‑‑ I think he's treated with aspirin at the hospital. It doesn't show that there were stitches. Is that part of the totality of the circumstances? I think the potential seriousness of the injuries is. But looking at the treatment is not necessarily the best way to look at that. It is undisputed that the diagnosis that was given at the hospital was ‑‑ if I can find it, I apologize. Well, Counsel, you can't have it both ways. You ask us to look at the totality of the circumstances, but now you want to limit what we look at in terms of the totality of the circumstances. In terms of the question of how he was feeling, how he was treated, it's not necessarily reflective of how he was treated. Well, it could be if he's losing copious amounts of blood, which in this case he wasn't. So I think your argument has to be that whether he was right or not, he thought he had a really serious injury that he might have and that he could lose consciousness. That has to be your argument. Well, that he had been injured enough that he might lose consciousness. Right, right, right. We're saying the same thing. And I'm not saying it for you, Lester. It's in your briefing. It's just that some of the stress testing here has been concerning. Because we are going to look at the totality of the circumstances. If I may, this is what the diagnosis was. It was closed head injury, facial stab wound, laceration of scalp, stab wound of head and stab wound of neck with complication. This is not an abrasion. This is not a scratch. This is something ‑‑  Okay. We understand. Thank you, Counsel. Thank you, Your Honor. Thank you to both counsel. The case is argued and submitted for decision by the court. We are in recess until 9.30 a.m. tomorrow morning. I'll rise. This court stands in recess until 9.30 tomorrow morning.
judges: RAWLINSON, CHRISTEN, JOHNSTONE